Argued March 24, affirmed May 12, 1925.

## JOHN SHARP v. C. A. McCARGAR ET AL.

(236 Pac. 262.)

**Pleading—Failure to Challenge Complaint by Motion or Demurrer Held to Preclude Assertion of Departure, if Proof Supported Either of Two Theories Alleged in Complaint.**

1. Where a pleading on a common count for money had and received alleged a cause of action in general *assumpsit* or on an express contract, defendants, who did not challenge the pleading by motion or demurrer, could not assert a departure, if the proof offered supported either theory of the complaint.

**Assumpsit, Action of—Party, Whose Performance of His Part of Contract Leaves Nothing to be Done but Payment of Money by Other, may Recover Amount Due Under Common Counts in Assumpsit.**

2. Party, whose performance of his part of contract leaves nothing to be done but payment of money by other, may recover amount due under common counts in *assumpsit*, using the contract as evidence.

**Appeal and Error—Finding of Trial Court on Conflicting Evidence Held Conclusive.**

3. Finding of trial court on conflicting evidence that contract was not extended or modified, *held* equivalent to verdict of jury and conclusive on Supreme Court.

**Appeal and Error—Supreme Court will not Presume Error.**

4. Supreme Court will not presume error.

---

1. See 21 R. C. L. 614.
3. See 2 R. C. L. 204.
4. See 2 R. C. L. 219.

Contracts—Contract to Advance Money Held not to Apply to
  Second-hand Automobiles.

5.  Contract to advance money to a person in business to pay
bills of lading and drafts upon automobiles to be placed in bonded
warehouse *held* not to apply to second-hand automobiles.

---

See (1) 31 Cyc. 726.  (2) 5 **C. J.** 1386–1388.  (3) 4 **C. J.** 883.
(4) 4 **C. J.** 732.  (5) 13 **C. J.** 525.

From Multnomah: G. W. PHELPS, Judge.

Department 2.

This action to recover money arose out of the
following facts and circumstances: Plaintiff was an
employee as salesman for J. H. Graham, who was
engaged in the automobile business in the City of
Portland. Graham had difficulty in financing his
business, and seemed unable to take up drafts cover-
ing the purchase price of automobiles shipped to
him from the factory. Plaintiff, on March 22, 1919,
in an effort to assist Graham in financing his busi-
ness, entered into the following contract with the
defendants, about which this controversy hinges:

"Confirming the understanding of our verbal
agreement made this morning, in consideration of
your contributing $5,000 in cash to be used by us
in paying bill of lading and drafts upon automobiles
to be placed in bonded warehouse for J. H. Graham
upon Case and Scripps-Booth cars, and such other
cars as he may handle as agent, we agree that 50
per cent of the brokerage on all such warehoused
cars charged by us shall be paid to you, and that a
settlement of said brokerage shall be made on the
first day of each month for all commercial paper
covering such warehoused cars which has been taken
up and the cars released from the warehouse during
the preceding month.

---

5.  See 6 R. C. L. 837.

"The terms of the brokerage agreement with Mr. Graham in connection with the warehouse paper are as follows: $75 to be charged upon Case cars for the first 30 cars, and $65 per car thereafter; $50 upon each Scripps-Booth car for the first 30 cars, and $40 for each car thereafter; all brokerage to be paid at the time the drafts are lifted and the cars warehoused by us.

"It is understood that no interest shall be paid by Mr. Graham for the first 60 days that such cars are warehoused, and that after such time Mr. Graham is to pay 8 per cent per annum.

"It is strictly understood and agreed between us that the $5,000 which you placed in our hands shall be used only for the purpose of paying drafts upon cars which shall be immediately warehoused, and shall in no case be used for the purpose of handling automobile installment contracts or lease paper.

"Under our agreement with Mr. Graham, we are entitled to a discount of one-half of one per cent per month upon all automobile installment contracts purchased by us, and it is further understood that we are to pay you 40 per cent of the discount collected by us on any and all installment paper handled for him, adjustment for such 40 per cent not to be made, however, until the end of the present calendar year.

"In the event that our agreement with you shall be terminated in any manner whatsoever, we agree to return to you the $5,000 which you have advanced us, subject only to the adjustment provided in the succeeding paragraph.

"It is also understood that in the event any loss shall be suffered by us in the handling of the warehouse paper, and that only, the same shall be adjusted upon a basis of 50 per cent of the loss to you and 50 per cent of the loss to us; your loss, however, not to exceed the sum of $5,000."

After the execution of this agreement Graham, according to the testimony of Mr. Lively, operated in the manner described as follows:

"A carload of cars, we will say, should be shipped and consigned to J. H. Graham, and sight draft, with the bill of lading, would be attached. The carload would arrive in Portland and then J. H. Graham would be notified. The banks would notify J. H. Graham that the draft was there in their possession. The cars would not be turned over to them until the draft had been taken care of. The draft was for the full amount that the J. H. Graham Motor Company or J. H. Graham personally had to pay the manufacturer. It was all inclusive of a part of the charge which was to be paid at that time. * * The usual method was to give a note upon each car so that one car might be sold or turned over and taken out of the warehouse on that note. That note would be made for the amount of the draft plus the freight charges—in almost all instances, plus freight charges to be divided by the number of cars in the carload lot, and the note would be made accordingly. That note would be brought to us, and we would give the check for it, with the understanding that the warehouse receipts, as unloaded, were to be delivered to us, and attached to the note and used as collateral security—evidence of the full amount J. H. Graham has had in money on these cars. J. H. Graham personally has no money in these cars, the majority of them. There might be some where the freight was paid, but in the majority of cases the freight was not paid. The entire amount was paid to the factory through this method, less the brokerage charges. Q. Now, as I understand it, when a carload of cars came, you not only paid the factory the cost of the cars, but you also paid the freight charges on them, is that right? A. Yes. The Court: Were the brokerage charges included in the note? A. Quite often. It was given to us by a check and sometimes it was drawn out of the check itself, which

we gave to him in a majority of the cases. Q. So that, Mr. Lively, as a matter of fact, all of these cars which were warehoused by you and by J. H. Graham and J. H. Graham Motor Company did not have a dollar in them? A. Very little, if any. Q. He advanced no money then himself? A. No. Q. This five thousand dollars, that was paid over to you by J. N. Sharp? A. Yes. Q. What was it used for? A. It was used in handling J. H. Graham's business, by taking care of warehoused cars. Q. These bills of lading and drafts—these notes that you received from J. H. Graham and J. H. Graham Motor Company—what would you do with these conditional sales notes? A. The amount of the money—the amount of the money invested in cars went beyond our actual finances, that is, the amount of money we had. We, therefore, used our credit, and I hypothecated these notes at the banks in each and every instance the bank—where we were warehousing the cars, where it was a warehouse note—the bank would insist that the warehouse receipt be attached to the note, and it became the collateral security which they had. The warehouse receipt was originally made by the warehouse company to J. H. Graham, and by him indorsed to us, and by us indorsed to the bank. And in one or two banks with which we had arrangements we were able to borrow up to ninety per cent of the face of the note. Q. Did you give your personal note and also this collateral security? A. We gave our personal note and this collateral security to the bank we were doing business with at that time."

Graham was financed, pursuant to the terms of this agreement, until November 30, 1919, when he ceased to do business, and the J. H. Graham Motor Car Company, a corporation, was organized by the plaintiff, Graham, McCargar and Lively, for the purpose of carrying on the automobile business in question. It is the theory of plaintiff that his contract

with the defendants terminated when Graham ceased to do business and that he is entitled to a return of his money upon demand. Defendants plead the execution of the above contract, and allege that when the corporation was organized it took over Graham's business, and it was understood and agreed by the parties hereto that the contract in question was to be extended so as to apply in the same manner and effect to the corporation as it had to Graham. Defendants further assert that the contract was construed by the parties thereto as applicable to second-hand cars as well as new, that after the corporation took over Graham's business it continued to operate under the terms of the agreement, and that plaintiff received his share of discounts and brokerage fees as provided therein, and by reason thereof is estopped "from refusing to abide by or carry out the obligations of said contract." Defendants assert that no adjustment or accounting has ever been had under the contract, and that the same is a condition precedent to the bringing of this action. It is not contended that any loss was sustained by the defendants while financing Graham, but it is alleged that a loss in excess of $40,000 was suffered by the firm during the time the business was conducted by the corporation. Defendants claim since plaintiff was to bear one half of such losses, he is not entitled to recover in this action. Plaintiff in his reply, aside from admitting the execution of the contract, denies each and every allegation of the further and separate answer. The cause was tried before the court without a jury, and resulted in a judgment against defendants in the sum of $5,000, together with interest thereon at the rate of 6 per cent per annum from

February 21, 1921, and for costs and disbursements.
Defendants appeal.                    AFFIRMED.

For appellant there was a brief over the name of
*Messrs. Senn & Recken,* with an oral argument by
*Mr. Frank S. Senn.*

For respondent there was a brief over the name
of *Messrs. Winter & Maguire,* with an oral argument
by *Mr. Robert F. Maguire.*

BELT, J.—1. Defendants' principal assignment of
error is that the plaintiff having brought this action
on a common count for money had and received,
there is a fatal departure in that the proof dis-
closes a written contract executory in its terms.
Plaintiff in his complaint alleges:

"That on or about the 29th day of March, 1919, the
defendants had and received of plaintiff the sum of
$5,000, which they promised and agreed to repay to
plaintiff upon demand.

"That plaintiff on or about the 21st day of Febru-
ary, 1921, demanded of defendants the return of said
money, which they declined, refused, and neglected
to do, and the whole amount thereof since said 21st
day of February, 1921, has been and now is due and
owing from defendants to plaintiff."

2. It is certain that a cause of action is stated,
whether it be considered an action in general *as-
sumpsit* or on an express contract. Since the com-
plaint was not challenged by motion or demurrer,
we are of opinion that defendants' contention is un-
tenable if the proof supports either theory. We are
not unmindful of the rule that an action for money
had and received cannot be supported by proof of
a special executory contract, for the law will not

imply a promise where an express promise exists: 5 C. J. 1386. In other words, the proof must support the theory of the complaint. It is also well established that where a contract has been fully performed by one party, and nothing remains to be done but the payment of money by the other, the party who has performed his part of the contract may sue for and recover the amount due under the common counts in *assumpsit,* using the contract as evidence: *Levin et al.* v. *Strempler,* 194 Ill. App. 299; 5 C. J. 1387; 2 R. C. L. 762. The rule that *assumpsit* does not lie where there is an express contract is applicable only when the contract is unexecuted. As quoted in *Freese* v. *Pavloski et al.,* 39 R. I. 512 (99 Atl. 13):

"When a contract has been fully executed and nothing remains to be done but the payment of the price agreed on, the plaintiff may declare specially on the contract, or he may rely on the common counts in *indebitatus assumpsit.*"

3. Let us consider the contract offered in evidence. Wherein is it executory so far as the plaintiff is concerned? Aside from paying to defendants the sum of $5,000, what more was there for him to do under its terms? It is conceded that defendants did not suffer loss while Graham was operating his business, and there is ample evidence that the contract had terminated, so it follows that plaintiff, upon demand, would have been entitled to a return of his money, unless the contract had been extended, as claimed by defendants. If plaintiff agreed that the $5,000 should be used by defendants in financing the company, as was done with Graham, then it would likewise follow that no recovery could be had, for the plaintiff's share of the losses sustained would exceed the amount of his investment. The evidence is con-

tradictory relative to this phase of the case, and the finding of the trial court that the contract was not extended or modified is equivalent to the verdict of a jury, and is therefore final and conclusive on this court.

4. Error is predicated on refusal of the court to permit witness for appellants to answer the following question, "Based upon the books and records of McGargar, Bates and Lively, can you tell the court how much brokerage was paid to John M. Sharp, plaintiff in this case, prior to November 20, 1919?" No offer of proof was made, and we are unable to say whether defendants' rights were substantially affected on account of the court's ruling in this respect. We will not presume error.

5. Exception is taken to the ruling of the court in sustaining an objection to a question asked plaintiff as to whether a profit or loss was made on a certain second-hand car owned by J. H. Graham and taken over by the corporation. The trial court was right in its ruling. As we interpret the contract it had no application to second-hand automobiles. The money advanced was to be used "in paying bills of lading and drafts upon automobiles to be placed in bonded warehouse." The contract further provided that the cars should be immediately warehoused and "in no case should the money be used for the purpose of handling automobile installment contracts or lease paper." Considering the contract in its entirety, we are satisfied that second-hand cars were not within the scope of its terms, and therefore the information sought to be elicited was irrelevant.

In view of the conclusions reached we do not deem it necessary to consider other minor assignments of error. Suffice it to say, we are of opinion that the

record is free from any error that would warrant a reversal.

The judgment of the lower court is affirmed.

Affirmed.

McBride, C. J., and Bean and Brown, JJ., concur.